UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

---

THOMAS STEINBECK, an individual; and BLAKE SMYLE, an individual,

               *Plaintiffs and Counterclaim Defendants,*

NANCY STEINBECK, an individual,

               *Intervenor-Plaintiff,*

   - v -

MCINTOSH & OTIS, INC., a New York corporation; THE STEINBECK HERITAGE FOUNDATION, a non-profit New York corporation; EUGENE H. WINICK, an individual; SAMUEL PINKUS, an individual; JEAN ANDERSON BOONE, an individual; FRANCIS ANDERSON ATKINSON, an individual; WAVERLY SCOTT KAFFAGA, an individual and Executor of the Estate of Elaine Anderson Steinbeck; DAVID SCOTT FARBER, an individual; ANDERSON FARBER RUNKLE, an individual; JEBEL KAFFAGA, an individual; BAHAR KAFFAGA, an individual; and STEVEN FRUSHTICK, an individual; and Does 1-10,

               *Defendants and Counterclaim Plaintiffs.*

NO.  04 CIV. 5497

(GBD)

---

**DECLARATIONS OF THOMAS STEINBECK, BLAKE SMYLE, GAIL KNIGHT STEINBECK AND MARK S. LEE IN OPPOSITION TO (1) THE ESTATE DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; AND (2) THE M&O DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## DECLARATION OF THOMAS STEINBECK

I, Thomas Steinbeck, declare:

1.    I am a plaintiff in this action.  If called upon to testify to the matters stated in this declaration I would and could do so based upon my personal knowledge except where otherwise indicated.

2.    Noted author John Steinbeck was my father.  I had one brother, John Steinbeck IV ("John IV"), who passed away in 1991.  Our mother was Gwen Conger.  Our father divorced our mother in 1948, and married Elaine Anderson Scott ("Elaine") in 1950.  He remained married to Elaine until his death.  My father had no other children.

3.    I have no children.  John IV had one daughter, Blake Smyle ("Blake"), who is my niece.  I am John Steinbeck's only living child and Blake Smyle is John Steinbeck's only grandchild.  None of the named defendants in this action are related by blood to my father.  Some of those defendants are related to Elaine.

4.    As the Court is no doubt aware, my father was a Nobel Prize-winning author of some of the great works of American literature.  For personal and professional reasons I have become very familiar with my father's works, at least from a literary perspective.  He published about 37 significant works and innumerable other stories and articles during his lifetime.  I spent considerable time with my father growing up, and had considerable interaction with him before his death.  I also paid considerable attention to his various public activities.  To the best of my knowledge, he did not significantly associate his name or likeness with merchandise or commercial services during his lifetime.

5.    My father died in 1968, and left a will.  I obtained a copy of that will, which I understand was filed with the probate court in New York.  A true copy of that will is attached as Exhibit 1.

6.    I have spent most of my working life in the creative arts.  In the late 1960's I served in the U.S. Army in Vietnam.  I served ten months in combat, then became a Specialist working as a combat Motion Picture Cameraman and Television Production Specialist for the Department of Defense and the Armed Forces Radio and Television Network.  Upon my release from the service, I worked as a freelance motion picture cameraman and photojournalist in Vietnam in the late 1960s and early 1970s.  I thereafter worked as a freelance line producer for broadcast and print advertising for Doyle Dane Bernbach and Dancer Fitzgerald Sample in New York.  I have, on occasion, taught college level courses on my father's works.

7.    I nevertheless have, since 1979, spent most of my professional life as a writer.  I have written film documentaries for the BBC, CBC, and various local television stations.  I have written and sold screenplays for a number of John Steinbeck's works and in other subjects.  I have written a book entitled *Down to a Soundless Sea*, which was published by Ballantine Books in 2002.  I do not think of myself as a businessman and I have no education, training or significant experience in intellectual property matters.  Throughout my career I have relied on the representations and legal advice given to me by my literary agents and others in connection with such matters.

8.    My father's will named Elaine and Henry Buchman as co-executors of my father's estate.  Shortly after my father's death they both told me that Elaine had inherited my father's copyright interests in his works, and that Elaine would be solely responsible for administering those rights.  I had no reason to doubt their representations, and given where I was living and what I was doing at the time, was not focused on those issues.  I am informed and believe that Elaine subsequently filed renewal registrations for some of my father's works that identified her as owning 50% of renewal rights, and my brother John IV and me as owning 25%

2

of the renewal rights each. I believe that happened with regard to about 18 of my father's works.

9.       About 1980, I learned for the first time that because there were three renewal claimants, each of us might be entitled to a one-third interest in some of my father's works. After raising but being unable to resolve the issue informally with Elaine, my brother John IV and I filed suit against Elaine to clarify our respective ownership interests in 1981.

10.      The 1981 suit was resolved by a Settlement Agreement executed in February of 1983. A true copy of that 1983 Settlement Agreement is attached as Exhibit 4. My brother and I also executed powers of attorney in favor of Elaine in connection with the Settlement Agreement. True copies of those powers of attorney are attached as Exhibit 5. By signing those documents, I understood that I was giving Elaine a power of attorney over all my copyright interests in my father's works.

11.      The literary agency of McIntosh & Otis, Inc. ("M&O") had acted for my father during his lifetime. M&O continued to act as a literary agent for Elaine, John IV and me regarding my father's works following his death. In about 1985, Eugene Winick became a principal of M&O. I am informed and believe that Mr. Winick is an attorney at law, and was previously at the firm of Ernst, Cane, Gitlin & Winick in New York. I understand that he provided legal advice to McIntosh & Otis concerning the Steinbeck works. I have obtained a letter Mr. Winick authored dated September 28, 1983 which evidences such advice. I have seen Mr. Winick's signature on many documents, and recognize it on the second page of Exhibit 6.

12.      Although I did not know this at the time, Elaine Steinbeck also signed a power of attorney in favor of Eugene Winick in 1985. I did not learn of that fact until 2004. A true and correct copy of that power of attorney is attached as Exhibit 7.

13.      I had frequent communications with Mr. Winick concerning the Steinbeck

3

works after he became a principle of M&O in 1985.  In those conversations, Mr. Winick told me

that he was an attorney and that he was knowledgeable about, and in fact was an expert on,

copyright matters.  Indeed, Mr. Winick has acted as an expert witness on such matters.  Attached

as Exhibit 8 is a true and correct copy of a declaration he submitted as an expert witness in a

copyright action that I obtained from court records.

14.     After he became a principle at M&O in 1985, Mr. Winick expressed

sympathy for me and my position.  He stated that he was an attorney-at-law who was expert in

matters involving copyright in the Steinbeck works at issue.  He repeatedly stated that he was my

brother's and my literary agent, he would look out for my brother's and my interests.  He

repeatedly represented that he and others at M&O were "taking care of" me, that he had my

brother's and my best interest at heart, and that he was acting in those best interests.  I had no

reason to doubt Mr. Winick's statements, and came to depend upon his representations and legal

advice concerning my intellectual property rights, as well as the representations and advice of

M&O employee and attorney Samuel Pinkus, M&O employee Evva Pryor, and other M&O

employees.  Unfortunately in retrospect, I was glad to have people who were so knowledgeable

advising me, and soon grew to trust them implicitly on such matters.  I relied on their advice and

counsel without question for many years.

15.     In about 1987 my brother John IV and I thought we saw an opportunity to

protect and enhance my father's literary legacy by producing feature films that were true to the

spirit of his literary works.  We formed a company called Steinbeck Films, Inc. ("Steinbeck

Films") that was based in New York.  Although I believe I was given the title of Chairman of

that company, I lived in California at the time, and had little to do with the daily business

operations of the company.  My role was to promote the company, write screenplays based on

4

my father's works, and discuss potential projects with persons or companies who might be interested in producing films based on those works.

16.     Steinbeck Films generated some media interest after it was formed. Attached as Exhibit 22 is an Associated Press news story that, as I recall, was published in about 1988.

17.     We used an image of my father drawn by artist Gene Gregan to promote Steinbeck Films. The image was printed on a card and would be distributed to people with whom we were discussing potential projects. A true copy of that image used on that card is attached as Exhibit 24.

18.     Steinbeck Films was very active from 1988 through about 1991. We approached companies in New York, California, Connecticut, Cannes, London and elsewhere about possible Steinbeck projects. Attached as Exhibit 23 are true and correct copies of a few letters to and from Steinbeck Films concerning such projects.

19.     Although my brother and I shared renewal interests in certain Steinbeck works, we knew that Elaine held a power of attorney for all Steinbeck works, and thus that we needed to get her permission to make motion pictures based on my father's works. Most of my communications on this subject at the time were with Mr. Winick at M&O, as well as another M&O employee named Evva Pryor. However, I also discussed this issue with Elaine.

20.     Elaine and Mr. Winick early on agreed that we could produce such features. Pursuant to that agreement, we entered into an option agreement with Monument Pictures for options to four Steinbeck works, including "Travels with Charley". A true and correct copy of correspondence and the negotiated option agreement for those works is attached as Exhibit 25. Phillip Rosen, an attorney who represented Monument Films, sent a copy of the

negotiated option agreement to Mr. Winick.  See Exhibit 25.

21.     In reliance on promises made by my stepmother and Mr. Winick, Steinbeck Films continued to work on those projects after the option issued so that a film could actually be made. I personally was involved in that effort. Attached as Exhibit 23 are a few letters to and from various individuals concerning the "Travels with Charley" project.

22.     I talked with Gene Winick and Evva Pryor extensively and repeatedly about those projects. In fact, Mr. Winick flew out to Los Angeles on one occasion to meet with me and individuals at Monument Pictures concerning those projects. Monument Pictures at the time shared space with Carolco, and I recall introducing Mr. Winick to the Weinstein Brothers at that time.

23.     The Monument Pictures option lapsed without production starting on any of those features. My brother John IV died in 1991 and the option agreement with Monument Films ended shortly thereafter. Steinbeck Films was dissolved as a corporate entity around that time. However, with the approval of Elaine and Mr. Winick I continued to promote a *Travels with Charley* motion picture. I continued to use the name "Steinbeck Films" and exerted considerable time, effort and expense to promote the project.

24.     In about 1991, I was approached by Jim Wilson of Tig Productions, Inc. about doing a *Travels with Charley* mini-series. I relayed this offer to Evva Pryor at M&O and representative of M&O and I had many communications about the possibility of that project.

25.     TIG had just completed a documentary entitled "Five Hundred Nations" which they had self-financed. After hiring David Rothenberg to adapt the material on three separate occasions, TIG came to the conclusion that the min-series market had dried up and they allowed the option to expire.

6

26.     Upon receiving further assurances, Mr. Winick, Ms. Pryor and others agreed that I could market rights in this property, so I continued my efforts to produce a "Travels with Charley" mini-series.

27.     I married my wife Gail Knight Steinbeck in 1995, and by 1998 she was helping me in my efforts to market *Travels with Charley*, and was communicating with the people at M&O about my rights in my father's works and projects associated with those works. After considerable expense and effort, we reached an agreement in principle with Mark Wolper at the Wolper Organization, in 2001 to produce a *Travels With Charley* miniseries for HBO.  A rights acquisition agreement was drafted and signed by me and by Mr. Winick as agent for Elaine Steinbeck for that project in 2001.  A true and correct copy of that agreement, along with associated correspondence concerning it, is attached as Exhibit 28.

28.     I had by this point spent considerable time, and expended tens of thousands of dollars in connection with *Travels with Charley*.  In the spring of 2002, HBO put the project into turnaround but by the end of that same year, CBS had expressed interest to move the project into prime-time at their network. However, after those years of effort, Ms. Pryor and Mr. Pinkus in 2003 advised The Wolper Organization, Warner Brothers Television, and me that the *Travels with Charley* project was "off the table."  Needless to say, the production did not proceed.

29.     Beginning in the early 1980s I had approved various uses of John Steinbeck's name and likeness.  For example, in 1982 I granted the use of the "Steinbeck" name to the Steinbeck Treatment Center in Salinas, CA.  That treatment center used the Steinbeck name until it closed in about 1998.

30.     In 1984 I granted permission for the "Steinbeck" name to be used by the

7

Steinbeck Credit Union in Salinas, CA.  That Credit Union has, with my permission, used the "Steinbeck" name since that time.  A true and correct copy of an image displaying the front of the credit union with the approved name is attached as Exhibit 16.

31.     From about 1987 through about 1998, I used the "Steinbeck" name in connection with "Steinbeck Films" as described above.

32.     In about 1990 I authorized the use of an image of John Steinbeck to be displayed with correspondence and other Steinbeck memorabilia at the Post Ranch Inn Restaurant in Big Sur, CA.  A true and correct copy of that image is attached as Exhibit 17.

33.     In about 1998, I approved John Steinbeck's name on a t-shirt in conjunction with a saying of my father's.  A true and correct copy of a photograph of one such t-shirt is attached as Exhibit 18.  Those "John Steinbeck" t-shirts were sold from about 1998 through to the present.

34.     In 2001 I approved name and likeness rights for John Steinbeck to be used in the motion picture "The Banger Sisters".  A true and correct copy of that agreement is attached as Exhibit 19.  In August of 2006 I authorized the National Endowment of the Arts to use certain John Steinbeck images in connection with something called the "The Big Read" project.  A true and correct copy of that agreement is attached as Exhibit 20.

35.     In 2006 I also authorized the use of two different images of my father on postcards.  True and correct copies of those approved images are attached as Exhibit 21.

36.     I stopped authorizing use of the Steinbeck name or likeness for a period after 1998 because of what Messrs. Winick and Pinkus told me.  Gail and I learned in 1999 that Elaine had, without my knowledge or input, established a non-profit organization called "The Steinbeck Heritage Foundation."  I learned that Elaine had also assigned "trademark" rights in

8

my father's name and likeness to the foundation, and licensed those rights to the National

Steinbeck Center in Salinas, CA. A true and correct copy of that assignment which my wife

obtained from Kim Greer, head of the National Steinbeck Center at the time, is attached as

Exhibit 26.

37.     I also paid attention to matters involving my father following his death,

and to the best of my knowledge Elaine following his death had not authorized use of my

father's name or likeness in connection with any merchandise or services from the time of his

death before 1998.

38.     When during the Steinbeck Festival in 1999, Gail and I asked Messrs.

Winick and Pinkus how Elaine could do that, he advised us, consistent with statements I

understand M&O and the Estate Defendants' have made in their motions, that Elaine inherited

those trademark rights through my father's will, and that I did not have any trademark rights. I at

the time knew very little about trademark rights, and in light of my long relationship with Mr.

Winick and M&O, believed their representations. I stopped authorizing use of my father's name

or likeness for several years thereafter for that reason.

39.     During the years after I signed a power of attorney and Eugene Winick

became a principle at M&O, M&O entered into a number of agreements concerning various

Steinbeck works. I was rarely provided with details concerning those agreements and

transactions, and often was given no information or documentation concerning them.

40.     In 1994, Elaine negotiated two 1994 agreements with Penguin Group

(USA), Inc., the long time publisher of my father's works. I was told about one of those

agreements, because I had a renewal interest in the works governed by that agreement, and was

later asked to ratify it. However, neither Elaine nor M&O provided me with a copy of that other

9

1994 agreement. True and correct copies of those agreements are attached as Exhibits 12 and 13.

41. Neither Elaine, Mr. Winick, nor anyone else at M&O told me that Elaine and I had a conflict of interest regarding termination rights, or that the 1994 Agreements could adversely affect my termination rights to Elaine's and her heirs' benefit. I would have objected to the agreements, consulted counsel, and then taken whatever legal action I could if I had known.

42. The first time I recall anyone at M & O mentioning termination rights was in 1999, when my wife Gail told me about a conversation she had had with Mr. Winick who said I had termination rights I could exercise after Elaine died, regardless of her will.

43. For a long time, I thought that my wife's initial conversation with Mr. Winick about termination rights took place in 1996, and the 1996 date is stated in the complaint in this action for that reason. However, while preparing my declaration for this motion, Gail and I found a reference to that first conversation in a business diary Gail started keeping in 1998. According to the diary, that conversation with Mr. Winick took place in June of 1999. A true and correct copy of that diary is attached as Exhibit 14 and the reference to the conversation is at page TB00886. That diary reference refreshes my recollection that the conversation actually took place in 1999, rather than 1996, and refreshes my recollection on the date.

44. Neither Elaine nor anyone at M & O advised me that Elaine could have started exercising termination rights for my benefit when she gained my power of attorney in 1985. They never told me that Elaine was not filing notices of termination to recover any book publishing rights or some motion picture rights, nor that Elaine was filing notices of termination that did not identify me or my niece Blake as owners of termination interests.

45. Although I did not know it at the time, during the 1990s M&O on behalf

of Elaine filed a renewal registration, two notices of termination, and a confirmation of termination for two additional works which did not identify Blake and/or me as an owner of relevant rights. Documents from the Copyright Office or website describing those actions are attached as Exhibits 9 and 10. Neither Elaine nor anyone at M&O ever told me anything about those registrations, or provided me with copies of the registrations.

46.     Beginning in the late 1990's, Elaine developed various health problems that adversely affected her, including a series of strokes. She eventually lost her driver's license and had a live-in nurse. Mr. Winick became even more heavily involved in administering the Steinbeck works following that time.

47.     My wife and I continued to ask Mr. Winick questions concerning our termination rights after the June 1999 conversation, and in January of 2000, he sent us a fax that attached a portion of the relevant copyright termination statute. He made marks and notations adjacent to the statute which stated, consistent with what he had told us, "Statute prevails over will. Cannot give the right away by will." A true and correct copy of legible portions of that fax is attached as Exhibit 15. (I must apologize to the Court for the poor quality of the first page of that document. That is the best quality copy I have of that document. Aside from the date and the reference "From Gene Winick," the first page of that exhibit is illegible. Other pages of the attachment are also illegible, and are not included in Exhibit 15 for that reason.)

48.     As Mr. Winick was my agent, attorney-at-law and copyright expert, in the light of my long relationship with him, I believed what he told me concerning my termination rights and did not take any action to investigate them further. I understood from Mr. Winick that I could exercise those rights after Elaine's death, and decided to discuss the issue with Mr. Winick after Elaine's death.

11

49.     I had known since 1970 that my brother John IV had had a daughter named Blake, but I lost track of where she was early on and did not know her whereabouts. After my brother John IV died in 1991, I realized that she was my only living blood relation, and wanted to get in contact with her. I asked Elaine, Mr. Winick, and others at M&O whether they knew where Blake was. Elaine refused to give me the contact information for Blake, telling me that "Blake wanted nothing to do with the family," Winick and others at M&O said they "…had no authority to do that and that you need to talk to Elaine."

50.     Following John IV's death, his ex-wife, Nancy Steinbeck, claimed that she inherited all of John IV's rights in my father's works. Nancy granted me her power of attorney over those works shortly after my brother's death.

51.     I understand that Nancy became unhappy with how M&O dealt with her, and that she complained, in writing, to the Association of Artist Representatives, a professional organization of which M&O is a member, in 2000 and 2001. M&O had previously begun expressing concerns regarding Nancy's title to John IV's copyright interests in my father's works. M&O encouraged me to pursue legal action in California to clarify title to my brother's interests.

52.     In about 2002, my wife, Gail, was finally able to get contact information for Blake from Jean Anderson Boone, Elaine's sister. I quickly worked to reestablish that family connection. Blake joined the San Diego Action shortly thereafter.

53.     I eventually filed suit in probate court in San Diego County to clarify those issues.

54.     Elaine died in 2003 and left a will. I have obtained a copy of that will, a true copy of which is attached as Exhibit 29.

55.     After Elaine died, I decided to follow up on the advice Mr. Winick had given me concerning federal termination rights. I tried to contact him to learn about those rights, but was told he was suffering from certain health problems and was not available. I then consulted separate counsel on the copyright and trademark issues about which Mr. Winick had previously advised me. I learned of the facts giving rise to the complaint for the first time after that.

I declare under penalty of perjury under the laws of the United States the forgoing is true and correct.

Executed this 15th day of October, 2008 at Montecito, California.

Thomas Steinbeck

13

## DECLARATION OF BLAKE SMYLE

I, Blake Smyle, declare:

1.      I am a named plaintiff in this action.

2.      John Steinbeck IV ("John IV") was my biological father, and noted author John Steinbeck was my biological grandfather. Thomas Steinbeck is my uncle. I was born Blake Steinbeck on October 5, 1970 in Saigon, Vietnam, where John IV and my mother were living. A true and correct copy of my birth certificate is attached as Exhibit 2.

3.      My mother and John IV separated about 1972. My mother married in 1973 and I was adopted by her husband and took the name Brown. I had periodic written or personal contact with John IV thereafter.

4.      I knew Elaine Steinbeck from the time I was a small child in the early 1970s until Elaine's death in 2003. John IV, my mother, and Elaine told me I was John Steinbeck's granddaughter. Although I don't remember it, my biological father, mother, and I lived in Elaine's apartment for a period of time in 1971 or 1972. I had frequent contacts with Elaine. She sent me letters, birthday and holiday presents growing up. She referred to herself as, and asked me to call her and think of her as, "Granny". I loved her as my grandmother. Attached as Exhibit 3 are true and correct copies of a few of the letters she sent me in which she so identified herself. She gave me a monetary gift for my high school graduation and again when she learned I was to study at the Royal Academy of Dramatic Arts in London. And when I asked if I could visit her or see her she always said yes and on one occasion I was invited to stay with her when I visited New York as an adult.

5.      During my weekend stay with Elaine we had long conversations about my grandfather, and my grandfather's works. I asked if there was ever any scholarship set up for young writers and she told me there was not that much money available for that. Whenever we

14

talked about my grandfather's works Elaine gave me the impression that she owned and controlled those works. She never said or hinted that I might have any copyright interest in any Steinbeck works. I loved and trusted Elaine, and thus believed what she said, and never had any reason to think I had any rights in John Steinbeck's works.

6.     I had no contact with my uncle Thomas Steinbeck when I was growing up after our time together in Vietnam. Neither my mother nor I knew where he was. Elaine never spoke of Thom. I was therefore very surprised when Thom contacted me in late 2002. Jean Boone called my mother because Elaine had my mother's number and Jean Boone gave me an overview of my potential rights and told me that my Uncle Thom was looking for me and wanted to talk with me. I gave Jean Boone permission to give my number to my Uncle Thom Steinbeck. After that contact, I learned for the first time in 2003 that I might have rights in connection with certain of my grandfather's works through my biological father John IV.

7.     I did not have any contact with M&O until February of 2003, at which time Sam Pinkus asked me to assign M&O my Power of Attorney. Though I refused to assign my Power of Attorney to M&O, I did assume that they would inform me of any rights I might have as a courtesy to John Steinbeck's family, particularly in that my mother had been introduced to M&O as Elaine's daughter-in-law.

I declare under penalty of perjury under the laws of the United States the forgoing is true and correct.

Executed this 15th day of October, 2008 at Boonsboro, Maryland.

Blake Smyle

15

## DECLARATION OF CRYSTAL BROWN

I, Crystal Brown, declare:

1.      I am not a party to and have no financial interest in this action.  I am the mother of Blake Smyle.

2.      Blake's biological father is John Steinbeck IV.  John IV and I were living in Vietnam in 1970 when Blake was born.  Upon returning to the United States, John IV, Blake and I lived for about one month in the apartment of Elaine Anderson Steinbeck, John IV's stepmother.  After moving into our own apartment, we visited with her frequently over the next year and when she introduced me to her friends and to the agents at M&O, I was introduced as her daughter-in-law and the mother of her grandaughter, Blake.

3.      John IV and I separated in December of 1972 and in May of 1973 I married Jimmy Brown.  He adopted Blake.  We nevertheless kept in touch with Elaine frequently.  She sent Blake letters, birthday and holiday presents and cards when Blake was a child.  I would sometimes read those letters to Blake, especially when she was a young child, and came to recognize Elaine's handwriting.  True and correct copies of some of the letters Elaine wrote are attached as Exhibit 3.  She always referred to herself as Blake's "Granny" in conversation and those letters, and encouraged Blake to call her and think of her as Blake's grandmother.  I know Blake loved and trusted her as a grandmother.

4.      Blake and Elaine developed a very close relationship over the years.  Elaine helped pay for Blake's term at the Royal Academy of the Dramatic Arts in London as Blake continued her academic studies.  Upon the death of John Steinbeck IV, Elaine called me to ask if I would prefer telling Blake of her biological father's death.  Out of respect for the intimate relationship that Elaine had created with Blake, I conceded to her and Elaine delivered the news to Blake.

5.   I was present when Elaine and Blake had conversations concerning her grandfather John Steinbeck, and occasionally, John Steinbeck's works. From before the time of Blake's birth Elaine always told John IV and me, and later Blake, that she was the executor of John Steinbeck's estate and owned and controlled his works. Elaine never said that Blake had any rights in John Steinbeck's copyrights, and gave the definite impression that Blake did not own any such rights. I had no reason to doubt what Elaine said, believed her, and so advised Blake.

I declare under penalty of perjury under the laws of the United States the forgoing is true and correct.

Executed this 15th day of October, 2008 at Boonsboro, Maryland.

Crystal Brown

17

## DECLARATION OF GAIL KNIGHT STEINBECK

I, Gail Knight Steinbeck, declare:

1.     I am not a party to this action.

2.     I married John Steinbeck in 1995.  Because I had some background in the entertainment business, in 1996 I began working with my husband Thom on some of his Steinbeck matters.  I began dealing with M&O regarding various Steinbeck projects in 1997, and beginning in 1998 had numerous conversations with Eugene Winick, Evva Pryor, and later, another M&O employee named Sam Pinkus on various matters.  I also traveled to New York and met with those people personally beginning in 1997 and 1998.

3.     These efforts were taking more and more of my time, came to be more time consuming and complicated than I thought they would be when I started to help keep matters straight, so I occasionally made notes of the conversations I was having with various individuals on various Steinbeck projects in a business diary starting in 1998.  A true and correct copy of that diary is attached as Exhibit 14.

4.     In June 1999, I had a conversation with Mr. Winick about "termination" rights.  In the conversation, he expressed sympathy towards my husband's position, and said he believed that Elaine had treated Thom badly.  He told me that once Elaine was gone we could remedy the situation by doing something called "terminating our copyrights."  He told me that the law would let us change the contracts that Elaine had signed, and that Thom would have everything.  I didn't understand what Mr. Winick was talking about.  I am not a lawyer, and had never heard of anything called copyright "termination interests" before that conversation.  However, Mr. Winick said it was in the Copyright Act.  He didn't elaborate further.  I relayed this information to Thom.

5.     For a long time, I thought that conversation with Mr. Winick took place in

the middle of 1996, and I note that Thom's complaint in this action lists that date. However, in reviewing my business diary and preparing this declaration, I realized that date is wrong. In fact, the first time Mr. Winick told me about termination rights was in a telephone conversation that took place on June 24, 2009 after 9 p.m. California time. I made notes about that conversation, which are set forth at page TB00886 of Exhibit 14.

6.     I was very interested in what Mr. Winick had said and I asked about termination rights, and repeatedly asked him about them after our first conversation. In January of 2000, he sent me a fax that attached what he said were pages of the Copyright Act that described termination rights. He also made marks and notes on those two pages. Unfortunately, the fax was printed on old fax paper, and many of the pages are very difficult to read. However, legible pages from the fax and attachment are attached as Exhibit 15. Although the reproduction of the first page is illegible, I can read the text on my original, and in it, Mr. Winick states that "accompanying are extracts from the copyright law. See page 84 and 87 which indicate the statute prevails even in the face of the will."

7.     In June of 1999, I also spoke with Sam Pinkus, an M&O employee who was also an attorney-at-law, and Mr. Winick regarding the fact that Elaine had started a Foundation. Mr. Winick and Mr. Pinkus said that they had told me about the Foundation before, but that was not correct. I learned about the formation of the foundation from Kim Greer, who was at the time the CEO of the National Steinbeck Center in Salinas, California. Mr. Greer had sent me a copy of an assignment Elaine had signed of her trademark assignment(?) to the Steinbeck Heritage Foundation. A true and correct copy of that assignment is attached as Exhibit 26.

8.     In my June 1999 conversation with Mr. Winick and Mr. Pinkus, they told

me that they had nothing to do with the formation of the Foundation. They also said that Elaine owned the trademark rights in John Steinbeck's name and likeness because she had inherited them through John Steinbeck's will. Notes summarizing some of that conversation are set forth at page TB00885 of Exhibit 14.

9.      Another of the subjects I discussed with Evva Pryor, Gene Winick, and others beginning in 1998 involved the "Travels with Charley" project. Elaine through M&O had given Thom the right to market that project. I personally had conversations with Evva Pryor and Gene Winick on many occasions in 1998 and 1999 concerning Thom's and my efforts to market "Travels with Charley" to Warner Brothers, HBO, CBS, and others. Notes referencing some of the conversations I had concerning Travels with Charley in 1998 and 2003 are summarized at what are designated pages TB00882, 883, 886, and 887 of the Diary, attached as Exhibit 14.

10.     In the many conversations I had with representatives of M&O concerning Travels with Charley beginning in 1998, they displayed an understanding that Elaine had given Thom  permission to market that project in all markets. They never gave any indication that the permission was conditional, contingent, or could be withdrawn by Elaine.

11.     Thom and I spent a great deal of time and money on the project. In 2001, Thom and I reached an agreement in principle with Mark Wolper at The Wolper Organization  to produce a "Travels with Charley" miniseries. Thom's attorney Phillip Rosen negotiated and drafted that agreement, which was signed by Thom and Eugene Winick of M&O on behalf of Elaine. A true and correct copy of that agreement is attached as Exhibit 28.

12.     Project development continued after 2001. However, after years of development efforts and after Thom expended significant additional monies on the project, M&O advised us that it was withdrawing Elaine's permission for the project, and that it was "off

20

the table."

13.     Beginning in early 2001, I began dealing less with Mr. Winick personally, and more with Mr. Pinkus. Our relationship with M&O became more difficult, especially after Elaine's death in 2003. When Thom couldn't reach Mr. Winick to get certain questions answered about Thom's termination rights, at that time, we decided to get independent legal opinion concerning those rights.

I declare under penalty of perjury under the laws of the United States the forgoing is true and correct.

Executed this 15th day of October, 2008 at Montecito, California.

Gail Knight Steinbeck

21

## DECLARATION OF MARK S. LEE

I, Mark S. Lee, declare:

1.      I am an attorney admitted to practice before all courts in the State of California and a number of Federal Courts.  I have been admitted pro hac vice to represent Thomas Steinbeck and Blake Smyle in this and other related actions.

2.      If called upon to testify in the matters stated here I would and could do so based upon my personal knowledge, except where otherwise indicated.  I would base that knowledge upon my personal participation as counsel of record for the plaintiffs herein, and upon my review of the file in preparation for this declaration.

3.      I have some experience in copyright law and copyright litigation, and reviewed Copyright Search Reports, Copyright Office records and the Copyright Office's online database to obtain information concerning certain works of author John Steinbeck that are identified in the 1994 book publishing agreement attached as Exh. 12, as well as certain other Steinbeck works.  I reviewed the above-described records to determine when copyright was secured in those Steinbeck works, and to determine whether any notices of termination of copyright grants John Steinbeck made in his lifetime had been recorded with the Copyright Office.

4.      I determined the copyright was secured on the Steinbeck works identified in Exh. 12 on the dates set forth in the chart included in paragraph 43 or Thom's and Blake's Rule 56.1 Statement In Opposition to the Estate Defendant's Motion For Summary Judgment.  Using the times for filing notices of termination set forth in 17 U.S.C. §304(c), I determined the years after 1985 in which notices of termination could have been served to retrieve book publishing rights in those works.  Those years are also set forth in the chart in paragraph 43 of

that Rule 56.1 Statement.

5.      I could discover no other notice of termination from Elaine Anderson Steinbeck or McIntosh & Otis in connection with book publishing rights in those works.

6.      I also discovered certain grants of motion picture rights in certain Steinbeck works, and determined the years in which notices of termination could have been served to retrieve those motion picture rights. A chart summarizing the results of that search are described in paragraph 45 of the Rule 56.1 Statement. I could discover no notice of termination to retrieve those rights filed by Elaine or McIntosh & Otis.

7.      Through my search efforts I did discover two notices of termination to recover motion picture rights. A copy of those notices of termination are attached as Exh. 9. I also discovered a "Confirmation of Termination" for two Steinbeck works. A true and correct copy of that document is attached as Exh. 10.

8.      I also discovered a renewal registration for the Steinbeck work "America and Americans." A true and correct copy of the summary of the summary of that renewal registration from the Copyright Office online database is attached as Exh. 11.

9.      I also searched the Patent and Trademark Office's online database for "Steinbeck" related registrations, and found five such registrations filed by The Steinbeck Heritage Foundation. True copies of the printouts for those registrations are attached as Exh. 27.

10.     There has been very limited discovery in this action since it has been filed. The McIntosh & Otis defendants served a request for production of documents on my clients, and my clients produced thousands of pages of documents in response to that request.

11.     My clients served a Request For Production of Documents on December 20, 2006. That request sought documents relevant to a number of the issues raised in the two

motions for summary judgment. A true and correct copy of that request for production of documents is attached as Exh. 30.

12. This office received a response from the M&O Defendants in which they objected to many of the requests, but promised to produce responsive documents once a confidentiality agreement was reached.

13. We engaged in a number of discussions concerning confidentiality provisions thereafter. Counsel for the M&O defendants, the Estate Defendants, and I tentatively agreed on conditions pursuant to which the documents could be produced. However, counsel for plaintiff in-intervention Nancy Steinbeck objected to our proposals. As a result, no documents have ever been produced.

14. While we attempted to resolve these issues, the appeal of the district court's grant of summary judgment approving notice of termination Thom and Blake had served to retrieve book publishing grants was proceeding, and discovery was not aggressively pursued. No other discovery has been pursued in this action.

15. The Estate Defendants filed their motion for summary judgment shortly after a panel of the Second Circuit reversed the district court's summary judgment in favor of my clients herein. Counsel for the M&O Defendants indicated an interest in filing its own motion for summary judgment shortly thereafter. I sent an email to opposing counsel pointing out that my clients had not received documents in response to their outstanding document requests, and that responsive documents could well produce additional evidence relevant to both motions for summary judgment. I proposed that the documents be produced before the motion for summary judgment was heard by the Court.

16. Counsel for both Estate Defendants and the M&O Defendants declined my

invitation.  A true and correct copy of an email string setting forth the correspondence is attached as Exhibit 31.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 15th day of October, 2008 at Los Angeles, California

_____/S/_____

Mark S. Lee

41328203.1